[844 NE2d 771, 811 NYS2d 317]

LeChase Data/Telecom Services, LLC, on Behalf of Itself and All Others Similarly Situated, Appellant, v Daniel Goebert et al., Defendants, and Business Funding Group, Inc., Respondent. (Action No. 1.)

LeChase Data/Telecom Services, LLC, on Behalf of Itself and All Others Similarly Situated, Appellant, v Mark Burgholzer, Doing Business as Business Funding Group, Respondent. (Action No. 2.)

Argued January 10, 2006; decided February 21, 2006

## POINTS OF COUNSEL

*Gates & Adams, P.C.,* Rochester (*Anthony J. Adams, Jr.* of counsel), for appellant. I. Whether a transferee of trust funds has "notice" is determined as of the time of the diversion and not as of some earlier time. (*I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.,* 73 AD2d 861, 51 NY2d 811.) II. The "innocent purchaser" proviso to Lien Law § 72 requires only "notice" and not "knowledge" when applied to one who is neither a bank nor a holder in due course. (*Bischoff v Yorkville Bank,* 218 NY 106; *Fidelity & Deposit Co. of Md. v Queens County Trust Co.,* 226 NY 225; *Hall v Bank of Blasdell,* 306 NY 336; *Bonham v Coe,* 249 App Div 428, 276 NY 540; *American Blower Corp. v James Talcott, Inc.,* 18 Misc 2d 1031, 11 AD2d 654, 10 NY2d 282; *Caristo Constr. Corp. v Diners Fin. Corp.,* 21 NY2d 507; *Chemical Bank of Rochester v Haskell,* 51 NY2d 85; *I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.,* 51 NY2d 811.) III. "Notice" that the transferred accounts were earned "in connection with a contract for improvement of real property" is sufficient to charge a transferee with liability under Lien Law § 72. (*Newburgh Sav. Bank v Town of Woodbury,* 173 NY 55; *People v Marrero,* 69 NY2d 382; *Kirsch v Tozier,* 143 NY 390; *Carl A. Morse, Inc. v Rentar Indus. Dev. Corp.,* 85 Misc 2d 304, 56 AD2d 30, 43 NY2d 952, 439 US 804; *Goldberger-Raabin, Inc. v 74 Second Ave. Corp.,* 252 NY 336; *Stryker v Cassidy,* 76 NY 50; *Raymond Concrete Pile Co. v Federation Bank & Trust Co.,* 288 NY 452.) IV. "Notice" to an agent is "notice" to the principal. (*Bonham v Coe,* 249 App Div 428; *Eljam Mason Supply v I. F. Assoc. Corp.,* 84 AD2d 720; *Grace v Corn Exch. Bank Trust Co.,* 287 NY 94; *Caristo Constr. Corp. v Diners Fin. Corp.,* 21 NY2d 507.) V. Plaintiff is entitled to summary judgment that Business Funding Group, Inc. had sufficient "notice" to make it liable for the diverted trust funds it received. (*Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851.) VI. Even if "actual knowledge" is required, the Business Funding Group, Inc. defendants are not entitled to summary judgment. (*Winegrad v New York Univ. Med. Ctr.,* 64 NY2d 851; *People v Johnson,* 65 NY2d 556; *People v Von Werne,* 41 NY2d 584; *Ben Soep Co. v Highgate Hall of Orange County,* 142 Misc 2d 45; *Eljam Mason Supply v I. F. Assoc. Corp.,* 84 AD2d 720.)

*Barth, Sullivan & Behr, LLP,* Buffalo (*Philip B. Abramowitz* of counsel), for respondents. I. This Court's explicit holding that

actual, subjective notice is required to overcome the "purchaser in good faith" defense under Lien Law § 72 (1) was properly applied here and consistently applied in other cases. (*I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.,* 51 NY2d 811; *Chemical Bank of Rochester v Haskell,* 51 NY2d 85; *MCC Proceeds v Advest, Inc.,* 293 AD2d 331.) II. Public policy favors clear, predictable rules in commercial dealings and the availability of alternative funding sources like Business Funding Group, Inc. to foster startups. III. Balancing the equities does not require imposing the risk of loss on the factor/bank; in fact, had appellant checked the record, it would have learned of the involvement of Business Funding Group, Inc., notwithstanding the fact that Business Funding did not file a notice of lending under the Lien Law; moreover, even with a duty of inquiry, Business Funding could not have learned of the construction activities of LeChase Data/Telecom Services, LLC. (*Fleet Credit Corp. v Cabin Serv. Co.,* 192 AD2d 421; *TMMB Funding Corp. v Associated Food Stores,* 136 AD2d 540; *J.K.S.P. Rest. v County of Nassau,* 127 AD2d 121; *Badillo v Tower Ins. Co. of N.Y.,* 92 NY2d 790.)

## OPINION OF THE COURT

READ, J.

We are asked to decide what kind of "notice" disqualifies a factor from exemption from Lien Law liability as a "purchaser in good faith for value and without notice" (Lien Law § 72 [1]). We conclude that actual knowledge of diversion of trust assets is not required, and that UCC 1-201 (25) supplies the proper standard of notice. We further conclude that defendants have not raised any triable issue of fact under this standard so as to preclude summary judgment for plaintiff.

I.

Plaintiff LeChase Data/Telecom Services, LLC is a specialty contractor that furnishes and installs telecommunications and data transmission facilities in new and existing buildings, and defendant Business Funding Group, Inc. is a factor, a company that lends money to others on the security of their accounts receivable. Business Funding's sole officer and director is defendant Mark Burgholzer, who operated his factoring business as a sole proprietorship prior to its incorporation in January 2001. The other key dramatis personae in this litigation are two now defunct enterprises: Light House Communication Design, Inc., a company that designed and constructed telecommunications

networks; and MCI WorldCom Network Services, Inc., a telecommunications services provider.

On October 26, 1999, Light House entered into an Outside Plant Engineering and Project Management Agreement with WorldCom "for the design, engineering, project management, procurement, construction, operation, maintenance, relocation and replacement of various telecommunications network projects within the United States." This was a master agreement, which contemplated that Light House would "provide, as required by [WorldCom], all the labor, equipment, materials and expertise, and to do all things necessary for the proper performance and completion of" projects specified in subsequent work orders. The work comprising these projects included design, engineering and project management services, and "construction of telecommunications network infrastructure."

In order to secure working capital for its fledgling business, Light House also entered into an Accounts Receivable Purchase Agreement with Business Funding on January 31, 2000. This factoring agreement set forth the terms under which Business Funding would advance moneys to Light House in exchange for assignment of its accounts receivable. Shortly thereafter, on February 4, 2000, Light House instructed WorldCom to pay all invoices directly to Business Funding. Specifically, Light House forwarded a copy of an individual invoice to Business Funding, which verified directly with WorldCom that the invoice accurately reflected the sum of money that WorldCom owed. Then Business Funding and Light House executed an account purchase addendum whereby Light House sold and assigned the invoice to Business Funding for an advance of 80% of its face value.[1] Upon WorldCom's payment of the invoice in full, Business Funding would rebate to Light House the difference between the advance and the invoice's face value, minus a factor's fee based on face value and the timeliness of WorldCom's payment.[2] In light of this arrangement, Business Funding filed a UCC-1 financing statement on February 14, 2000 to preserve its

---

1. Burgholzer testified that, on occasion, Light House would request an advance for less than the face value of an invoice. Business Funding would advance funds in the amount requested, and would divide that amount by 0.8 to create a "fictitious" face value to be used for purposes of calculating the rebate and factor's fee.

2. Burgholzer testified that, at Light House's option, rebates were sometimes applied to offset advances on outstanding invoices rather than remitted to Light House by check.

rights as a secured creditor of Light House under article 9 of the Uniform Commercial Code. Business Funding did not, however, file a notice of assignment (Lien Law § 15) or a notice of lending (Lien Law § 73).

On September 15, 2000, Light House subcontracted out to LeChase part of two projects for the design and construction of telecommunications facilities in Monroe County, which were undertaken under separate work orders executed pursuant to Light House's master agreement with WorldCom. This subcontract included standard provisions for LeChase to bill Light House monthly, and to receive progress payments as Light House, in turn, was paid by WorldCom.

By February 2001, LeChase had substantially completed its construction work on these projects. Between September 2000 and April 2001, LeChase submitted monthly progress payment applications to Light House, which were included with Light House's monthly invoices to WorldCom. The total amount that Light House owed LeChase for its work was $973,475.32. Light House paid LeChase $453,000, leaving an unpaid balance of $520,475.32.

By early April 2001, Light House had ceased doing business. Later that same month LeChase sued Light House and its principals and controller for breach of contract, and also asserted claims against these parties and WorldCom and Business Funding for diversion of statutory trust funds in violation of article 3-A of the Lien Law. Light House, its principals and WorldCom subsequently filed for bankruptcy, and LeChase's claims against these defendants were eventually severed.

On August 8, 2001, LeChase filed mechanic's liens for the sums remaining due from Light House on the Monroe County projects. After learning that Light House had entered into the factoring agreement prior to Business Funding's incorporation, LeChase commenced a second action in May 2002 against Mark Burgholzer, doing business as Business Funding Group, again alleging diversion of statutory trust funds.

LeChase and Business Funding profess ignorance of each other's dealings with Light House until the spring of 2001. LeChase's controller avers that his company was never advised that Light House might assign payments due from WorldCom for the two projects to a third party, "[h]ad [it] been so informed, [LeChase] would never have proceeded with the subcontract," and LeChase first learned in March 2001 that Light House had,

in fact, factored these receivables. Burgholzer insists that his "understanding at all times was that Light House was not engaged in the construction or installation work on these projects" and more specifically, he "was never aware of [LeChase's] involvement until this litigation began." Instead, it was his "understanding that Light House was involved only in the design and inspection of the 'underground' and 'aerial' cables, termination equipment, and splicing work on the projects." Between December 1999 and March 2001, WorldCom paid Business Funding $1,279,209.21 on account of Light House's invoices for the two Monroe County projects. Thus, Burgholzer believed that Light House earned $1.2 million over 14 to 15 months from WorldCom for engineering (what he described as "laying out the fiber optics line") and inspection work only.

On December 31, 2002, LeChase moved for summary judgment in both actions. LeChase argued that Business Funding violated article 3-A of the Lien Law when "receiv[ing] statutory trust funds (to which [LeChase] is the only known beneficiary) exceeding [the amount of money owed LeChase by Light House] (a) based upon void assignments and (b) with actual or constructive knowledge of their trust nature." On April 1, 2003, Business Funding cross-moved for summary judgment to dismiss the complaint. Business Funding contended that because Burgholzer "had no actual knowledge of any construction or installation activities by Light House," Business Funding was a "purchaser in good faith for value and without notice" under Lien Law § 72 (1), and therefore was not subject to article 3-A.

In a comprehensive opinion, Supreme Court first observed that article 3-A is intended to make sure that subcontractors who improve real property at the behest of an owner or contractor are actually paid for their work; and that the rights of Business Funding, as assignee of the accounts receivable due and owing from WorldCom to Light House, were no greater than the rights of its assignor, Light House. The court then concluded that WorldCom's payments to Business Funding for the Monroe County projects were subject to the Lien Law's trust obligations, including LeChase's rights as a trust beneficiary; that the transfer or use of trust assets for any purpose other than a purpose of the trust was a diversion of trust assets under Lien Law § 72 (1); and that LeChase, as a trust beneficiary, could enforce the trust against Business Funding under Lien Law § 77. The court pointed out that Business Funding had the means to protect its interests by filing a notice of assignment

complying with Lien Law § 15, or a notice of lending complying with Lien Law § 73 (*see also* Lien Law § 73 [3] [d] [deeming a properly filed notice of assignment which meets the requirements of Lien Law § 15 to be a notice of lending]), but neglected to do so. Accordingly, the factoring agreement and the assignment of individual invoices did not comply with section 15, and constituted an unenforceable and improper diversion of statutory trust assets.

Next, Supreme Court reviewed the exception to liability under article 3-A for "a purchaser in good faith for value and without notice" (*see* Lien Law § 72 [1]).[3] The court examined three potential sources for defining notice in this context: general common-law trust principles; the Uniform Commercial Code; and case law requiring actual knowledge, principally *I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.* (51 NY2d 811 [1980]). The court distinguished the case law on the basis that the plaintiffs there were "attempting to enforce a claim for diversion of trust assets against a bank which was a depository of checks by a trustee or the purchaser of negotiable paper" (2 Misc 3d 195, 205 [Sup Ct, Monroe County 2003]). Relying upon general principles of trust law and the general statutory definition of "notice" in the Uniform Commercial Code, Supreme Court concluded that

> "the notice requirement[s] under Lien Law § 72 for a 'good faith purchaser' are those defined in UCC 1-201 (25). Notice that a transfer is a diversion of trust assets for a good faith purchaser for value under Lien Law § 72 (1) occurs when there is actual knowledge, when there is a notice or notification, *or from all the facts and circumstances known at the time of the transfer there is reason to know that it is a diversion of trust assets*" (2 Misc 3d at 207-208 [emphasis added]).

Finally, the court concluded that there was a triable issue of fact regarding notice, and so denied both LeChase's motion and Business Funding's cross motion for summary judgment.

LeChase appealed and Business Funding cross-appealed. The Appellate Division held that "[i]t is well settled that a plaintiff

---

**3.** This provision states that "[n]othing in this article [3-A] affects the rights of a holder in due course of a negotiable instrument or of a purchaser in good faith for value and without notice that a transfer to him is a diversion of trust assets."

must establish actual notice to overcome the defense that one was a purchaser in good faith under the Lien Law" (12 AD3d 1093, 1095 [4th Dept 2004]). To support this holding, the Appellate Division relied on *I-T-E* and cited two other cases—*Bank of Babylon v Zaffuto Constr. Co.* (157 AD2d 640 [2d Dept 1990]) and *Colonia Ins. Co. v United States* (1996 WL 68533, 1996 US Dist LEXIS 20290 [ED NY, Jan. 25, 1996]). Further, the Court determined that LeChase failed to establish Business Funding's actual knowledge; and that Business Funding was therefore entitled to judgment as a matter of law. Accordingly, the Appellate Division modified Supreme Court's order by granting Business Funding's cross motion and dismissing the complaints. LeChase sought our permission to appeal, which we granted.

## II.

Article 3-A of the Lien Law impresses with a trust any funds paid or payable to a contractor "under or in connection with a contract for an improvement of real property" (Lien Law § 70 [1]).

> "We have repeatedly recognized that the primary purpose of article 3-A and its predecessors [is] to ensure that those who have directly expended labor and materials to improve real property [or a public improvement] at the direction of the owner or a general contractor receive payment for the work actually performed" (*Aspro Mech. Contr. v Fleet Bank*, 1 NY3d 324, 328 [2004] [internal quotation marks and citations omitted]).

To this end, Lien Law § 72 (1) declares any other use of contract funds "before payment or discharge of all trust claims" to be an improper diversion of trust assets, regardless of the propriety of the trustee's intentions (*see Matter of RLI Ins. Co., Sur. Div. v New York State Dept. of Labor*, 97 NY2d 256, 263 [2002]). Section 77 authorizes a trust beneficiary to recover trust assets from anyone to whom they have been diverted with notice of their trust status.

In this case, there is no dispute that the master agreement between WorldCom and Light House and the contract between Light House and LeChase qualify as contracts to improve real property subject to article 3-A (*see* Lien Law § 70); or that Light House's assignments to Business Funding were improper diversions of statutory trust funds (Lien Law § 72 [1]); or that LeChase is a trust beneficiary entitled to recover trust assets

(Lien Law § 77). The only contested issues are what type of notice would disqualify Business Funding from the benefit of the exception to liability under article 3-A for a good-faith purchaser; and whether there are triable issues of fact regarding the requisite notice.

■ We agree with Supreme Court that UCC 1-201 (25) supplies the proper standard of notice in this case, and that actual knowledge is not prerequisite to depriving Business Funding of the protection of the exception in Lien Law § 72 (1) for a good-faith purchaser. *I-T-E*, *Bank of Babylon* and *Colonia Insurance* do not mandate otherwise.

In *I-T-E*, the defendant bank set off a past due note with the balance of a contractor's bank account (*see I-T-E Imperial Corp.—Empire Div. v Bankers Trust Co.*, 73 AD2d 861 [1st Dept 1980]). A lone check from the property owner had been deposited into the account two months previously, and a supplier alleged that the bank should have known that these funds were trust funds. The Appellate Division noted that the New York "rule of first in, first out" (*id.*) meant that all of the trust funds had been expended long before the bank seized the balance—a circumstance clearly and completely different from this case. Further, the bank had no duty to police expenditures to ensure that trust funds were properly allocated by its customer.

We affirmed summary judgment in favor of the bank, observing that

> "[w]ith the adoption . . . of the [UCC], the concept of notice under article 3 (and by analogy under article 4 as well, cf. Uniform Commercial Code, § 4-209) has . . . been changed from an objective to a subjective standard, and that change must be deemed to have amended the Lien Law as well" (*I-T-E*, 51 NY2d at 813-814 [citation omitted]).

Thus, plaintiff could not "rely on the 'duty of inquiry' concept" and no question of fact remained as to the bank's status as a good-faith purchaser (*id.* at 814).

In *Babylon*, the plaintiff bank credited a subcontractor's account with the discounted value of a promissory note signed by the defendant contractor. When the bank presented the note for payment upon maturity, the contractor refused payment. The Appellate Division determined that the bank was a valid holder in due course, did not have actual knowledge of any improper diversion (the note contained "no evidence" that trust assets

were at issue [157 AD2d at 641]) and therefore affirmed judgment in its favor. In this case, Business Funding was not a valid holder in due course. Rather, the assignment to Business Funding was invalid for purposes of the Lien Law. Further, the assignments, in fact, did contain some evidence that trust fund assets may have been at issue.

In *Colonia*, the United States criminally charged a contractor with bid rigging, and filed a civil forfeiture action to recover the proceeds of the scheme—progress payments deposited in the contractor's accounts at two banks. The United States and the contractor subsequently entered into a stipulation for dismissal of the forfeiture action in exchange for the immediate forfeiture of these funds. Subsequently, subcontractors to whom the contractor owed money obtained judgments against the plaintiffs on the surety bond. The plaintiffs then sued for an order directing the United States to pay them the forfeited funds.

The Federal District Court observed that the civil forfeiture recovery statute allows recovery for an innocent lienholder; the subcontractors were trust beneficiaries and lienholders under the Lien Law; and the plaintiffs, as their subrogees, were entitled to sue the United States for diversion of trust funds. The United States argued that the complaint failed to state a cause of action, however, because it was a good-faith purchaser.

Citing *I-T-E*, the court stated broadly that "New York courts have interpreted [Lien Law § 72 (1)] to require a plaintiff to show subjective, not objective, notice" (1996 WL 68533 at *4, 1996 US Dist LEXIS 20290 at *13), but then pointed out as relevant whether the government knew that the bank account was regularly used for trust assets and whether the government knew the company's financial condition. These factors bear on notice, but would not establish actual, subjective knowledge. The court determined that the complaint alleged facts sufficient to support a finding that the United States had notice that it was receiving trust assets, but did not explain why this was so. Logically, of course, the criminal charge itself—rigging a bid on a contract with the New York City School Construction Authority—establishes notice.

In *I-T-E*, we specifically related the requirement for actual knowledge under section 72 (1) to the "concept of notice" in articles 3 and 4 of the Uniform Commercial Code, which govern commercial paper and bank deposits and collections respectively (*see* 51 NY2d at 813). "The purpose of UCC 3-304 (7)—unique

to New York and Virginia—[is] to require that questions of notice [are] determined by a subjective test of actual knowledge rather than an objective test which might involve constructive knowledge" (*Hartford Acc. & Indem. Co. v American Express Co.*, 74 NY2d 153, 162 [1989]). A holder in due course such as the bank in *I-T-E* will have customarily accepted trust assets in the form of an endorsed check, and cannot evaluate the trust status of every check deposited by all its contractor or construction-related customers.

By contrast, Business Funding entered into a contractual relationship with Light House, and at the outset had a copy of its business plan and a right to copies of its business records. Business Funding had procedures in place to check with WorldCom to make sure that each individual invoice was payable before agreeing to purchase and advance funds against it. These kinds of considerations support looking to article 1 of the Uniform Commercial Code rather than articles 3 and 4 for the standard of notice applicable to a factor seeking shelter as a good-faith purchaser. Further, as Business Funding acknowledged by filing a UCC-1 financing statement, its factoring arrangement is an article 9 financing transaction. Article 9 does not define notice (*see* UCC 9-102 [a]), or refer to the definition of notice in articles 3 and 4 (*see* UCC 9-102 [b]); therefore, article 1's general definitions and principles of construction and interpretation are most appropriately applicable (*see* UCC 9-102 [c]).

Finally, Business Funding urges us to adopt the standard of actual, subjective knowledge on public policy grounds, arguing that otherwise we will discourage a source of alternative funding for startup companies that may not qualify for bank loans. Factors may readily avoid the risk of loss, however, by filing proper Lien Law notices and screening accounts receivable.

### III.

LeChase maintains that Business Funding has failed to raise a triable issue of fact regarding its notice of the trust and the diversion, and we agree. Burgholzer knew or should have known that Business Funding was receiving payments from WorldCom for construction of improvements to real property.

Business Funding received copies of the work orders for the two Monroe County projects. Both work orders referred to the master agreement as controlling the services to be provided by

Light House to WorldCom. The master agreement[4] included construction among these services, and the work orders detailed the construction work. For example, the work order for one of the projects specified that

> "[a]uthorization is confirmed for contractor to perform the following services: This project will link the Linden Oaks Node to the Henrietta Node to the Clinton Square Node with a new 144 FOC [fiber optic cable]. Project will consist of new and existing underground as well as new aerial placement. Project will also provide termination equipment at each site and all necessary field splicing."

The other work order similarly authorized Light House to construct specified portions of a telecommunications network. These work orders should have alerted Business Funding that Light House was furnishing construction services—not just engineering and inspection work—under its contract with WorldCom.

Business Funding's files contain a list of WorldCom's construction managers and their telephone numbers, and there are various e-mails and notes that refer to approval of Light House's invoices by WorldCom's construction managers. This is because Business Funding regularly contacted WorldCom's construction managers, and knew that WorldCom would not pay an invoice from Light House until a construction manager signaled satisfactory completion of the work billed. Business Funding's knowledge that WorldCom's construction managers reviewed Light House's invoices for approval further leads to the inference that Business Funding should have known that these invoices were for construction work.

Accordingly, the order of the Appellate Division should be reversed, with costs; defendants' cross motion for summary judgment denied; and plaintiff's motion for summary judgment granted.

---

**4.** According to Burgholzer, Business Funding did not receive a copy of the master agreement. Under the factoring agreement, however, Business Funding had the right to the original and one copy of each invoice submitted for its possible purchase as well as "a copy of the bill of lading, proof of delivery, contract or purchase order, and other documents satisfactory to Factor." The factoring agreement further obligated Light House to "furnish [Business Funding] with full financial statements and other documents and information, including but not limited to proof of payment and/or compliance with all Federal, State and/or local tax requirements, as may be reasonably requested by [Business Funding] from time to time."

Chief Judge KAYE and Judges G.B. SMITH, CIPARICK, ROSEN-BLATT, GRAFFEO and R.S. SMITH concur.

Order reversed, etc.